## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

**STONEX COMMODITY SOLUTIONS
LLC f/k/a FCSTONE MERCHANT
SERVICES, LLC, a Delaware Limited
Liability Company,**

   **Plaintiff,**

**v.**

**THOMAS BUNKLEY, III, an
individual,**

   **Defendant.**

**CASE NO. 1:23-CV-00735 JMR-LF**

**DEFENDANT THOMAS BUNKLEY, III'S MOTION PURSUANT TO FEDERAL RULE
OF CIVIL PROCEDURE 56(D) AND RESPONSE IN OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Thomas Bunkley III ("Bunkley") files this Motion Pursuant To Federal Rule

Of Civil Procedure 56(d) ("56(d) Motion") and Response in Opposition to Plaintiff StoneX

Commodity Solutions ("StoneX")'s Motion for Partial Summary Judgment ("StoneX Motion")

and respectfully shows the Court as follows:

### PRELIMINARY STATEMENT

On February 8, 2024–less than three weeks after Magistrate Judge Fashing issued an

Initial Scheduling Order, and before the parties had held a Rule 26(f) conference, StoneX filed its

Motion.  StoneX's Motion claims that, despite collecting $10 million from the primary debtor in

2023, it is also entitled to nearly $5 million from Defendant, an individual, due to a personal

guaranty. StoneX's Motion contains more than 14 pages of factual assertions, despite no

discovery having taken place and that StoneX contends there is no fact issue in this case.

This Court should deny the Motion for at least two reasons. First, Defendant is currently

in possession of little, if any, of the documents and information related to StoneX's claims.

Defendant's former company, CapRock Land Company, LLC ("CapRock") is in bankruptcy, and CapRock's documents related to the transactions at issue—transactions between StoneX and CapRock—are in the hands of the bankruptcy trustee in that matter. Moreover, many (if not most) of the documents that show the true nature of these transactions are in the hands of StoneX.

Second, these documents, as well as the evidence set forth in this Response, will show that there is at least a question of fact as to whether the transactions that are the subject of the Motion are loans, contrary to the contentions of StoneX and the careful wording it chose for the agreement it executed with CapRock. The evidence also, at a minimum, creates a fact issue as to whether these loans were made by StoneX at criminally usurious interest rates in violation of New York law. Thus, there is a question of fact whether the underlying debt from StoneX to CapRock is void, which in turn voids the Guaranty that is the basis of StoneX's Motion.

### 56(D) MOTION

Defendant believes its Response below sets forth sufficient evidence to create a fact issue and fully defeat StoneX's Motion. But, because no discovery has taken place in this case, much of the factual information related to the issues in StoneX's Motion is not in the hands of Defendant. Therefore, if the Court does not deny StoneX's Motion on the grounds set forth in Defendants' Response, the Court should continue StoneX's Motion or deny it with leave to replead after the completion of discovery.

A.   **Argument**

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may either (i) defer the motion, (ii) deny the motion outright, (iii) allow time for discovery, or (iv) "issue any other appropriate order." Fed. R. Civ. P. 56(d).

"Rule 56(d) is designed to safeguard against a premature or improvident grant of summary judgment." *United States ex rel. Polukoff v. St. Mark's Hosp.*, No. 2:16-CV-304-TS-EJF, 2020 WL 1139141, at *1 (D. Utah Mar. 9, 2020) (*quoting Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 833 (10th Cir. 1986)) (internal quotations omitted). "The central tenet of Rule 56([d]) is that summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1264 (10th Cir. 2006) (quotations omitted).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, ***after adequate time for discovery*** and upon motion[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added). Thus, "[t]he Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery." *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed.Cir.1988). In other words, "summary judgment should not . . . ordinarily be granted before discovery has been completed." *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 354 (5th Cir. 1989) (citation omitted).

### *Rule 56(d) Motions Should Be Granted Freely Before Discovery.*

Because of the general policy strongly favoring discovery of all relevant facts, in most cases, "denying the right to have full discovery on all pertinent issues before a summary judgment is granted would be error, particularly in the face of a Rule [56(d)] affidavit." *Miller v. United States*, 710 F.2d 656, 666 (10th Cir. 1983). For these reasons, "'unless dilatory or lacking in merit,'' a party's Rule 56(d) application "should be liberally treated." *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1553–54 (10th Cir.1993) (quoting *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1521-22 (10th Cir. 1992)). The

D.C. Circuit has held that Rule 56(d) motions are granted "almost as a matter of course unless the nonmoving party has not diligently pursued discovery of the evidence." *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995) (citation and quotation omitted).

This is even clearer when a party files a motion for summary judgment prior to discovery. "Where there has been no adequate initial opportunity for discovery, a strict showing of necessity and diligence that is otherwise required for a Rule 56([d]) request for additional discovery does not apply." *Metropolitan Life Ins. Co. v. Bancorp Servs.*, *L.L.C.*, 527 F.3d 1330, 1337 (Fed. Cir. 2008). Where, as here, "a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56([d]) motion fairly freely." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003). The Sixth Circuit has put it more concisely: "[t]ypically, when the parties have no opportunity for discovery, denying the Rule 56([d]) motion and ruling on a summary judgment motion is likely to be an abuse of discretion." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008).

Here, StoneX filed for summary judgment before the parties had even conducted their joint status conference, before a scheduling order had been issued, and before any discovery whatsoever has taken place. In such a situation, the next step should be to proceed with a proper case schedule, not to attempt to dispose of the case before any facts are learned. Thus the Court should grant Defendant's Rule 56(d) Motion and allow discovery to commence, particularly given the fact that there are relevant facts Defendant needs to discover, as shown below.

### *There are Relevant Probable Facts Unavailable*

To be afforded relief under Rule 56(d), a party opposing summary judgment need not present evidentiary facts, but rather must explain by affidavit or declaration why facts precluding summary judgment cannot be presented. *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1105 (D.N.M. 2015) (quoting *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)). This consists of identifying "the probable facts not available and what steps have been taken to obtain these facts. In the Tenth Circuit, the nonmovant must also explain how additional time will enable him to rebut the movant's claim that there are no genuine issues of material fact." *F.D.I.C. v. Arciero*, 741 F.3d 1111, 1116 (10th Cir. 2013).

As stated, because discovery has not begun, Defendant's burden to explain necessity is considerably lower. "Where there has been no adequate initial opportunity for discovery, a strict showing of necessity and diligence that is otherwise required for a Rule 56([d]) request for additional discovery [] does not apply." *Metropolitan Life*, 527 F.3d at 1337. Nevertheless, as set forth in the Declaration of Dean Allen ("Allen Decl."), Exh. A, and the Declaration of Brett Charhon ("Charhon Decl."), Exh. B, there are facts unavailable to Defendant that would create a fact issue (if not directly refute) StoneX's summary judgment claims. StoneX's summary judgment, in essence, argues that Defendant executed a guaranty (the "Guaranty") promising to pay any and all amounts due from CapRock to StoneX. StoneX and CapRock are parties to a related Amended and Restated Master Origination and Sale/Repurchase Agreement ("StoneX Agreement"), a copy of which is attached as Exhibit D.

As explained in detail below in the Response, StoneX carefully worded the StoneX Agreement to appear to be a purchase and sale agreement whereby CapRock would sell inventory to StoneX and then buy it back at an ever-increasing higher price when CapRock

intended to sell the inventory to CapRock's real customers. In reality, though, the StoneX Agreement was an agreement whereby StoneX would provide CapRock with financing secured by inventory—a loan.

Under New York law (which all parties agree applies to the StoneX Agreement), usurious loans are void and the borrower is relieved of all repayment obligations. *See* General Obligations Law § 5–511; *Seidel v. 18 E. 17th St. Owners*, *Inc.*, 79 N.Y.2d 735, 740 (1992) ("[t]he consequences to the lender of a usurious transaction can be harsh: the borrower is relieved of all further payment—not only interest but also outstanding principal, and any mortgages securing payment are cancelled.") Guaranties on criminally usurious loans are likewise void. *See, e.g., Sasidharan v. Piverger*, 993 N.Y.S.2d 646 (Sup. Ct. 2014), *aff'd* 44 N.Y.S.3d 85 (2016).

To successfully bring a defense of criminal usury on a debt, a guarantor must provide evidence establishing there was "[(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] [interest] was charged by the holder or payee with the intent to take interest in excess of the legal rate [of 25% per annum]." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 89 (2013). Each of these issues is a question of fact, and the Court should allow Defendant to conduct discovery on these facts.

As to the first element of criminal usury, Defendant believes that there is ample evidence to create a fact issue on whether the StoneX Agreement and the transactions undertaken thereunder were loans. Defendant provides that evidence in Defendants' Response to StoneX's Motion below. However, should the court determine that Defendant has not yet established a fact issue, THE Court should allow Defendant to conduct discovery on that issue. Defendant also needs expert discovery to unravel and explain the complex transactions made pursuant to the StoneX Agreement.

One gating issue for discovery is the fact that the StoneX Agreement specifically states that the terms of each StoneX-CapRock transaction will be contained within a document called a "Confirmation." Defendant has never seen a document called a "Confirmation" for any transaction, and needs discovery on what StoneX referred to as a "Confirmation," and the source of those documents and related information.  (Declaration of Thomas Bunkley, III ("Bunkley Decl."), Exh. C, at ¶ 8). Moreover, for many of the transactions, StoneX may not have provided CapRock with full set of the documents setting forth the actual "buyback" price that StoneX unilaterally determined.

In addition, CapRock repeatedly informed StoneX that StoneX's books were incorrect, in that StoneX had failed to credit CapRock for approximately $3 million worth of soybeans that had been converted to soybean meal and oil. (Bunkley Decl. at ¶ 21).Thus StoneX's soybean "inventory" it claims CapRock owes is significantly overstated. (Bunkley Decl. at ¶ 21).

On the second element of criminal usury, interest in violation of [the criminal] usury statute, using the data available to Defendant, Dean Allen, a Certified Public Accountant, has determined that the interest rates charged by StoneX are not "prime plus 5 percent" as the StoneX Agreement provides, but rather appear to exceed even 90 percent in some cases. (Allen Decl. at ¶¶ 1-2, 8, 12, 16-18). However, this data is preliminary, and Defendant needs discovery on StoneX's side of these transactions, including its internal accounting procedures and deposition testimony of StoneX representatives, to calculate the actual interest rates StoneX charged and the true character of the transactions between CapRock and StoneX. (Bunkley Decl. at ¶¶ 14, 20; Charhon Decl. at ¶¶ 8, 11-12; Allen Decl. at ¶¶ 6-7).

For example, the prices StoneX charged CapRock when CapRock "bought back" the grain from StoneX were unilaterally chosen by StoneX. First, StoneX unilaterally chose a fixed,

higher "buyback" price at the time of the initial "purchase" by StoneX, and would not complete the transaction if CapRock did not agree to that amount. (Bunkley Decl. at ¶ 14). Second, when CapRock then actually "bought back" the grain, StoneX would set yet another price–even higher than the fixed price it imposed at the beginning of the transaction. (Bunkley Decl. at ¶¶ 24, 28). These prices were not negotiable. (Bunkley Decl. at ¶ 28). CapRock has no knowledge of the methodology used by StoneX to calculate any of its "buyback" pricing or the rationales behind this pricing. (Bunkley Decl. at ¶ 28).

Second, from time to time, StoneX would effectively raise the "buyback price" of existing contracts, a process it referred to as "rolling the position." Moreover, if that "rolling of the position" raised the total owed by CapRock above a "notional" limit (a limit StoneX also unilaterally determined), StoneX would demand that CapRock pay an amount StoneX set unilaterally to bring the debt down below this notional limit. (Bunkley Decl. at ¶ 17, Bunkley Exhibit 3). CapRock had no visibility into "rolling the position" or StoneX's unilateral calculation of the extra amount CapRock was then required to pay. (Bunkley Decl. at ¶¶ 16-17).

Not only is discovery needed from StoneX, Defendant no longer has access to CapRock's records, including its "NewBos" database, due to CapRock's bankruptcy. (Bunkley Decl. at ¶ 19). Such documents are, to Defendant's knowledge, currently in the hands of the bankruptcy trustee. Defendant only has sporadic documentation related to the transactions between CapRock and StoneX, and thus is currently unable to fully document either side of the CapRock/StoneX transactions.

Without access to these materials, Defendant is unable to tie the various "sales" and "buyback" prices for transactions, nor is Defendant able to determine the exact interest rates StoneX charged with certainty. (Bunkley Decl. at ¶¶ 16-18, 20, 28; Allen Decl. at ¶¶ 5-6).

Moreover, Defendant is unable to reconcile StoneX's practices with the wording of the StoneX Agreement. Defendant thus needs further discovery in order to firmly establish the amounts charged by StoneX on the transactions at issue.

Defendant also needs further discovery on the final issue–intent. Currently there is no testimony or other evidence regarding StoneX's determinations with regard to these transactions as the parties only just conducted their rule 26(f) conference, and depositions have not been conducted.

There are several items related to intent that Defendant needs to investigate. For example, StoneX's own records show that it had full knowledge that CapRock paid StoneX nearly $10 million in cash in 2023–not including the amounts StoneX kept and "credited" to existing debt (which amounted to another $6.9 million).  (Bunkley Decl. at ¶ 36).Yet StoneX also knew that despite all these payments, CapRock's indebtedness to StoneX actually *increased* over that time, and the amount of grain that StoneX claimed to own went up by more than 35%. (Bunkley Decl. at ¶ 36, Allen Decl. at ¶ 11). As such, $10 million in cash payments did not change CapRock's financial position with StoneX for the better in any way. Despite this knowledge, StoneX continued its usual business practices with regard to CapRock. Deposition and document discovery is needed to determine StoneX's understanding and reaction to these facts.

Moreover, there is evidence that shows StoneX did not consistently credit "repurchases" by CapRock to specific purchases in a chronological or systematic manner, as the parties had generally agreed through their course of dealing. Rather it appears that StoneX unilaterally decided which "purchases" StoneX would credit these "buybacks" against–possibly in a way that increased the amounts of interest and principal CapRock owed. (Bunkley Decl. at ¶¶ 18, 28). Further discovery is needed to ascertain the extent of these "cherry-picking" transactions,

StoneX's motives and rationales behind them, and the overall net effect they had. (Bunkley Decl. at ¶ 20).

A full list of the items needed by Defendant is set forth in the Charhon Declaration, the Allen Declaration, and the Bunkley Declaration (Exhibits A-C). With this discovery, Defendant will be able to, at a minimum, create a fact issue that the underlying transactions are criminally usurious loans under New York law–making Defendant's alleged Guaranty unenforceable.

### _No Discovery Steps Have Been Taken To Date Because Discovery Has Not Started_

The answer to the second element, what "steps have been taken to obtain these facts" is straightforward. As there has been no opportunity to conduct discovery, no steps have been taken to secure these facts, which are largely in the hands of StoneX and its representatives and CapRock's bankruptcy trustee. Defendant needs an opportunity to take discovery in order to secure these facts, which will negate StoneX's Motion.

Because discovery has not begun, Defendant's diligence is held to a minimal standard. _See Metropolitan Life_, 527 F.3d at 1337 (strict showing of diligence does not apply if there has been no adequate initial opportunity for discovery). Moreover, the fact that much of the information Defendant seeks is in the hands of StoneX underscores the need for discovery in this case. "The movant's exclusive control of such information is a factor weighing heavily in favor of relief under Rule 56([d])." _Price_, 232 F.3d at 783.

### _Additional Time For Discovery Will Help Rebut StoneX's Motion_

As stated, StoneX alone has custody of much of the information that Defendant needs to show definitively that the StoneX Agreement was a usurious loan transaction. Thus, if Defendant is granted time to conduct discovery pursuant to a scheduling order, Defendant will be able to

acquire this information from StoneX and its representatives (amongst others) and rebut the claims made in StoneX's Motion.

### B.  Conclusion

For these reasons, the Court should find StoneX's Motion premature until after Defendant obtains the necessary discovery. However, this Court also has the option of simply denying StoneX's Motion for the reasons set forth in the Response, which would render this Rule 56(d) Motion moot. *See e.g. Cortez v. McCauley*, No. CV 02-1458 MCA/WDS, 2004 WL 7338158, at *5 (D.N.M. Mar. 17, 2004), *aff'd in part, rev'd in part*, 478 F.3d 1108 (10th Cir. 2007). Thus, in lieu of denying StoneX's Motion for the reasons set forth in the Response, the Court should grant Defendant's Rule 56(d) Motion and continue or deny StoneX's Motion with leave to replead after discovery in this case is completed.

### RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Although StoneX's Motion is extremely premature at this stage of the case, Defendant can show, even without the benefit of discovery, that the Court should deny StoneX's Motion. The scant evidence presented to date cannot satisfy StoneX's summary judgment burden.

### FACTS IN MATERIAL DISPUTE

Defendant generally objects to StoneX's Statement of Material Facts ("Statement") to the extent that the facts in the Statement set forth legal conclusions or attempt to characterize legal documents that speak for themselves. Defendant also specifically objects to the Statement in the numbered paragraphs below which correspond to the paragraph numbers in the Motion.

5.     Disputed. As described in this Response and in the Bunkley Declaration (Exh. C), the transactions between StoneX and CapRock were loans disguised as "an inventory purchase program." It is undisputed that under the terms of the StoneX Agreement, "CapRock Land would

have an obligation to buy back through completion of mandatory contractual procedures" in the StoneX Agreement.

7.      Disputed that "it was always the intention of StoneX that its entire exposure to CapRock Land, however incurred, would be subject to all conditions set forth in the December 13, 2019 E-Mail, including Mr. Bunkley's personal guaranty." Such self-serving subjective statements by StoneX underscore the need for discovery in this matter prior to dispositive motion practice. StoneX's predecessor-in-interest, FC Stone Merchant Services, and CapRock had entered into the predecessor to the StoneX Agreement about a year prior to the email set forth in this paragraph, and two years prior to Mr. Bunkley's execution of the Guaranty. (Bunkley Decl. at ¶¶ 5-6). As such, it cannot be true that StoneX always intended that its transactions with CapRock "would be subject to all conditions set forth in the December 13, 2019 E-Mail, including Mr. Bunkley's personal guaranty."

8.      Disputed. As stated above the transactions between StoneX and CapRock were loans, and not "for the sale, purchase, storage and/or delivery" of grain as StoneX contends. (Bunkley Decl. at ¶ 23).

10.     Disputed. Here, StoneX is characterizing the language of the Guaranty when it states that "Mr. Bunkley is bound as surety for and co-principal debtor with CapRock Land, and that Mr. Bunkley will pay immediately and unconditionally on first demand to StoneX any indebtedness owed by CapRock" and that "Mr. Bunkley acknowledged in the Guaranty that he was incurring these obligations for adequate consideration." Moreover, StoneX bases the second contention on language in a recital to the Guaranty, which is not an operative part of the Guaranty. *See, e.g.*, *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1018 (10th Cir. 2018), as revised (Apr. 13, 2018); *Burr v. Am. Spiral Spring Butt Co*., 81

N.Y. 175, 178 (1880) ("Recitals in a contract are not strictly any part of the contract."); *Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp.*, 791 N.Y.S.2d 409, 410 (N.Y. App. 2005) ("[R]ecitals . . . are not part of the operative agreement."); *Ross v. Ross*, 253 N.Y.S. 871, 882 (N.Y.App.Div.1931) ("The recitals in a contract form no part thereof."), *aff'd sub nom.*, *Hutchison v. Ross*, 262 N.Y. 381 (1933).

11.     Disputed. StoneX alleges that it need not make any demand or attempt to collect an alleged debt from CapRock before exercising its alleged right to collect from Defendant under the Guaranty. This is not a proper statement of fact, and it is not the law. *See, e.g., Gallo v. Los Lunas Pub. Sch.*, No. CV 01-1316 WPJ/ACT, 2003 WL 27384773, at *2, n.3 (D.N.M. Nov. 5, 2003) (improper to submit a "Statement of Facts" that is "peppered" with legal argument.). Under New York law, the creditor must first establish that there is a valid debt owed and that the debtor has failed to pay. *See, e.g., 245 Park Member LLC v. HNA Group (Int'l) Co. Ltd.*, No. 22-CV-5136 (JGK), 2023 WL 3587702, at *2 n.1 (S.D.N.Y. May 19, 2023) (on a guaranty of payment, "[i]f for some reason, the debtor fails to make payment to the creditor, he can proceed directly against the guarantor.")

14.     Disputed. As explained in this Response and in the Bunkley Declaration, the transactions between StoneX and CapRock were loans disguised as "an inventory purchase program." CapRock would neither "sell" nor deliver grain to StoneX.

15.     Disputed. As explained in this Response and in the Bunkley Declaration, the transactions between StoneX and CapRock were loans disguised as "an inventory purchase program." It is undisputed that CapRock was required to "'repurchase' the Commodity and pay StoneX a fixed, higher "sale price" in order to repay the loans (Bunkley Decl. at ¶¶ 24, 28). It is

also disputed that StoneX actually charged the fixed, higher "sales price," as it instead charged a unilaterally-determined even higher price.  (Bunkley Decl. at ¶ 28).

16.     Disputed. As explained in this Response and in the Bunkley Declaration, the transactions between StoneX and CapRock were loans disguised as "an inventory purchase program." With StoneX's full knowledge and approval, CapRock often sold and transferred commodity to an ultimate buyer before it "bought the grain back" from StoneX. (Bunkley Decl. at ¶ 25).

17.     Disputed that "[u]pon receiving notification from CapRock Land of its desire to execute a Sale Transaction as to a particular Commodity, StoneX would evaluate whether to agree to the proposed Sale Transaction." StoneX played no role in whether and when CapRock sold grain to an ultimate customer, nor did StoneX ever refuse to "sell" grain back to CapRock. (Bunkley Decl. at ¶ 24). CapRock merely told StoneX to "release inventory to A/R" and StoneX would demand payment at a fixed, higher price within 60 days (Bunkley Decl. at ¶¶ 16-17, 24).

22.     Disputed. The claims of contractual breach are ultimate questions in this case and are not properly placed within an alleged statement of undisputed facts. *See, e.g., Virgin Mobile USA, L.P. v. Keen*, 447 F. Supp. 3d 1071, 1079 (D. Kan. 2020) (noting that objections to statements of fact are valid when "the content [of the statement] is largely conclusory determinations of ultimate legal questions in th[e] case.").

23.     Disputed. The claims of contractual breach are ultimate questions in this case and are not properly placed within an alleged statement of undisputed facts. *See, e.g., Keen*, 447 F. Supp. 3d at 1079.

28-32.  Disputed. The claims of contractual breach are ultimate questions in this case and are not properly placed within an alleged statement of undisputed facts. *See, e.g., Keen*, 447 F. Supp. 3d at 1079.

Moreover, as set forth in this Response and in the Bunkley Declaration, Defendant has noted errors in StoneX's calculations of amounts owed, as well as evidence of StoneX "cherry picking" transactions in order to maximize its revenue and preserve the maximum amount possible that CapRock owed to StoneX. (Bunkley Decl. at ¶¶ 20-21). As set forth in the Rule 56(d) Motion above, Defendant requires discovery in order to fully determine the proper accounting treatment for the transactions between StoneX and CapRock. Additionally, the transactions are loans, and there is at least a fact question as to whether they were subject to criminally usurious interest rates under New York law.

40.    Disputed. Defendant does not dispute that the Bankruptcy Court issued an order in the CapRock matter on August 31, 2023, in the form attached as Exh. BB to StoneX's Motion. Defendant disputes the characterization that by this Order "CapRock Land obtained relief from the Bankruptcy Court in the form of an order granting its motion based in part on" the declaration of Defendant submitted in that case, particularly the portions of that declaration specifically set forth by StoneX in paragraphs 37-39 of StoneX's Statement.

49.    Disputed. Defendant does not dispute that the November 14, 2023 bankruptcy court hearing was held in part "to approve a sale under 11 U.S.C. § 363." Defendant disputes the characterization that "the Court granted CapRock Land's Motion in part upon Mr. Bunkley's testimony and the representations of CapRock Land's counsel," particularly those portions of testimony, and pleadings specifically set forth in paragraphs 42-48 of StoneX's Statement.

56.     Disputed. StoneX's statement that "[f]inally, StoneX's recoveries in the Bankruptcy Case or otherwise from CapRock Land because the Guaranty is of payment and not collection . . ." is incomprehensible.

## STATEMENT OF DEFENDANT'S FACTS

The following facts related to StoneX's Motion are undisputed.

**I.     CapRock's Business and the StoneX Agreement**

A.     CapRock Land Company, LLC ("CapRock") is a limited liability company specializing in the trade of organic agricultural commodities. Defendant has been its managing member. (Bunkley Decl. at ¶ 2). As part of CapRock's day-to-day business, it engaged in the buying of grain—primarily soybeans and soybean products, and primarily from overseas suppliers. (Bunkley Decl. at ¶ 3).CapRock would either resell the grain to its domestic customers or process the grain into meal and/or oil and sell that final product to its customers. (Bunkley Decl. at ¶ 3). CapRock primarily stored its products at two facilities, one in Baltimore, Maryland, and the other in Stockton, California. (Bunkley Decl. at ¶ 4). CapRock did not own either facility. (Bunkley Decl. at ¶ 4).

B.     StoneX is a Delaware limited liability company and is a wholly owned subsidiary of StoneX Group, Inc. Prior to August 2021, StoneX was known as "FC Stone Merchant Services, LLC." (Bunkley Decl. at ¶ 5). StoneX's primary business is financing commodities for its customers.

C.     In August 2018, StoneX and CapRock entered into a Master Purchase and Sale Agreement ("the Original Agreement"). (Bunkley Decl. at ¶ 5). On or about March 12, 2020, StoneX sent Bunkley a "Personal Guaranty" (the "Guaranty") and demanded he execute it. (Bunkley Decl. at ¶ 6).On or about October 13, 2022, CapRock and StoneX entered into an Amended and Restated Master Origination and Sale/Repurchase Agreement (the "StoneX

Agreement"), which is the contract governing the transactions at issue in this case. (Bunkley Decl. at ¶ 7).

D.      As written, the StoneX Agreement contemplates a series of individual transactions whereby CapRock would use StoneX's funds to purchase grain for ultimate resale. The StoneX Agreement is written such that StoneX would "buy" the grain from CapRock, and then, when CapRock sold the grain (or processed meal/oil) to ultimate customers, CapRock would "buy" the grain back from StoneX. (StoneX Agreement at §2.1). The StoneX Agreement does not provide an agreed "price" or specific terms for the StoneX "purchase" or CapRock "buyback." Instead, per the terms of the StoneX Agreement, these terms were to be included in documents called "Confirmations" which were executed for each StoneX-CapRock "purchase" and "sale." *Id.*

E.      In reality, there were no documents called "Confirmations" traded between the parties. (Bunkley Decl. at ¶ 8). The parties actually dealt with each other under the StoneX Agreement as follows. First, CapRock would compile information on its open (non-shipped) sales contracts to end customers from its "NewBos" software database. Defendant would contact StoneX and provide this sales information. (Bunkley Decl. at ¶¶ 9-10). StoneX would then agree to "buy" a quantity of commodity from CapRock at 75% of the average sales price from the data CapRock provided. (Bunkley Decl. at ¶ 11). CapRock would then issue an "Invoice" to StoneX for the amount of grain StoneX bought and the 75% price. (Bunkley Decl. at ¶ 11).

F.      At the same time, StoneX would send a document called a "Sale Contract" back to CapRock. (Bunkley Decl. at ¶ 12). This document set forth the terms under which CapRock would buy the grain back from StoneX, including, importantly, the purchase price, which was always higher than the Invoice amount StoneX "paid" for the same grain when it "bought" the grain from CapRock. (Bunkley Decl. at ¶ 12). Per its terms, the Sale Contract document made

full repayment due "Net 60," or in sixty days. (Bunkley Decl. at ¶ 13). The Sale Contract contained a line for CapRock to sign, but also specifically stated that failure to actually notify StoneX of a rejection constituted acceptance. (Bunkley Decl. at ¶ 13).

G.     The terms of conditions of each Sale Contract gave StoneX discretion to deem CapRock in "total breach" if it failed to either "order any shipments" of the grain at issue or "to tender any payment hereunder when due." (*See, e.g.,* Exhibit 2 to Bunkley Decl.; Allen Decl. at Schedule 5.1). In contrast, StoneX was deemed to not be in total breach even if it "[failed] to ship any installment hereunder when due." *Id.*

H.     Officially under the StoneX Agreement, StoneX took title to the grain it "purchased," but StoneX never actually took possession or otherwise directed activities related to its "purchased" grain. (Bunkley Decl. at ¶¶ 23, 24). Moreover, StoneX's grain was never sequestered or separated from grain that was titled in CapRock's name (e.g., grain that had been repurchased by CapRock) and StoneX never expected or requested that CapRock make any attempt to set apart or separately track the grain StoneX had "purchased" from the other grain owned by CapRock. (Bunkley Decl. at ¶¶ 23, 24). Per the terms of the StoneX agreement, all storage costs related to StoneX "owned" grain were passed on to CapRock, and CapRock agreed to indemnify StoneX for all such costs. (StoneX Agreement at §2.1(e); Bunkley Decl. at ¶23, 24). At no point did the actual grain leave the possession of CapRock until it was delivered to CapRock's ultimate customer. (Bunkley Decl. at ¶ 23). StoneX never marketed grain, and in fact, because the grain was organic, StoneX could not do so, since it did not have the requisite certificates. (Bunkley Decl. at ¶ 23).

I.     StoneX had full access to CapRock's books and records for the duration of the StoneX Agreement. (Bunkley Decl. at ¶ 26). Those records never noted inventory as "belonging

to" StoneX. Instead, the dollars borrowed by CapRock from StoneX were listed as liabilities on CapRock's books. StoneX never attempted to "correct" this bookkeeping practice. (Bunkley Decl. at ¶ 26).

J.      The StoneX Agreement contains a provision that set an interest rate "at a rate equal to the lower of (i) the then-effective prime rate of interest publicly announced plus five percent per annum; or (ii) the maximum applicable lawful interest rate" from the inception of the loan on all late payments. (StoneX Agreement, Exh. D, at § 3.6). Thus, StoneX had fixed a higher repayment price at the time it "bought" the grain, and could begin accruing interest on that higher repurchase price as soon as 60 days had run from StoneX's initial "purchase."

K.      In reality, when CapRock "bought back" the grain from StoneX, it would do so at a different price that StoneX unilaterally determined—a price that was *even higher* than the price StoneX had determined under the Sales Contract. (Bunkley Decl. at ¶ 28). This price was non-negotiable, and does not appear to relate to the original fixed "buyback" price in the Sale Contracts or to the StoneX's Agreement's "late payment" interest rate. (Bunkley Decl. at ¶ 28).

L.      The StoneX Agreement provided several examples of Events of Default by CapRock, for which StoneX was provided remedies in Article 7, including unilaterally declaring a default, terminating the StoneX Agreement and all individual transactions occurring pursuant to the StoneX Agreement, unilaterally calculating an amount owed to StoneX by CapRock (called the "Net Settlement Amount") and demanding that CapRock pay that amount within one day of notice. In other words, upon an event of default, Stone, as lender, can unilaterally declare default, call in and accelerate the loan, and demand immediate repayment. (StoneX Agreement §§ 7.1, 7.2, 7.4, and 7.7).

M.      One of the enumerated Events of Default in the StoneX Agreement occurs if "[CapRock] fails to make a payment due by it under or in relation to this Master Agreement, any Transaction hereunder, or any other Transaction Document." (Definitions, Exh. A to StoneX Agreement, at "Event of Default" (a)). Another Event of Default occurred if CapRock ever missed a payment on a loan with a principal value of more than $100,000, regardless of the value of the grain StoneX "owns." (Definitions, Exh. A to StoneX Agreement, at "Event of Default" (f) and "Cross Default Threshold").

N.      Most tellingly, Section 2.4(a) specifically provides that the remedies for "Events of Default" set forth in Article 7 shall be available to StoneX if CapRock "fails to repurchase the entire quantity of the Purchased Commodity in accordance with a Sale Transaction." (StoneX Agreement, at § 2.4(a)). In other words, if CapRock fails to "repurchase" the entire amount of grain it "sold" to StoneX as required, the StoneX Agreement gives StoneX the right to declare default, cancel the Agreement and all transactions under the Agreement, accelerate the amounts owed, and demand payment in one day.

O.      Thus the StoneX Agreement and its subordinate Sales Contracts force CapRock to rebuy the grain it "purchased" from StoneX at a higher price than StoneX paid, regardless of market conditions, and give StoneX the right to charge interest on the grain's value starting at 60 days from the moment it is "purchased" by StoneX until it is "bought back" by CapRock.

P.      Although the StoneX Agreement reads as if there are specific CapRock-StoneX "purchase" and "sale" transactions tied to each other, the reality was that the two parties engaged in a very fluid transaction set where CapRock "sold" grain to StoneX when it needed financing and used sales to ultimate customers to fund "buybacks." (Bunkley Decl. at ¶ 25). However, with StoneX's full knowledge and blessing, CapRock would often sell and ship grain to ultimate

20

customers before "buying" it back from StoneX. (Bunkley Decl. at ¶ 25). The parties' general arrangement was that, when CapRock would "buy back" grain from StoneX, Stone X would credit the oldest "sale" in a "First In-First Out" manner. (Bunkley Decl. at ¶ 20). However, StoneX exercised sole discretion with regard to the choice of which prior "sale" to StoneX CapRock had "bought back." (Bunkley Decl. at ¶ 20). On several occasions, StoneX may have taken advantage of the fluid nature of the transaction set by "cherry picking" the transactions it would credit when CapRock paid it back. (Bunkley Decl. at ¶ 20). This allowed StoneX to maximize the amount outstanding while still receiving the same repayment.

Q.     Section 5.1(l) of the Stone Agreement provides that, "to protect StoneX in the event that [the StoneX Agreement] is for any reason . . . characterized in whole or in part as a secured transaction and not a true sale by a court of competent jurisdiction," StoneX is deemed to have a security interest in over a page's worth of assets of CapRock, including all stored grain and related assets, as well every o*ther asset* of CapRock, whether related or not to StoneX or the StoneX Agreement:

> (ix) to the extent not otherwise described herein, **all fixtures and personal property of every kind and nature including all accounts, goods (including inventory and equipment)**, documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and **all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; (x) to the extent not otherwise described herein, all proceeds and products of each of the foregoing**, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing; **and (xi) all other assets of Customer (collectively, the "Subject Assets").**

Stone X Agreement at §5.1(l) (emphasis added).

II.     **CapRock's Decline Due to Outside Forces and StoneX's Acceleration**

R.      Prior to 2022 the price of soybeans, soybean meal and related products remained generally stable or was increasing, so the StoneX Agreement produced a stable, predictable cash flow for the parties. (Bunkley Decl. at ¶ 27). However, prices for soybeans and soybean meal peaked in the summer of 2022 and declined through the remainder of 2022 and throughout 2023, ultimately declining by nearly 40 percent. (Bunkley Decl. at ¶ 27).

S.      These price declines placed CapRock in an untenable position. In the unprecedented declining price environment, CapRock's transactions with StoneX would effectively go as follows: First, CapRock would find soybeans or soybean meal to buy on the open market. (Bunkley Decl. at ¶ 28). Then it would purchase that product, and finance that purchase by "selling" it to StoneX for 75% of the market value, agreeing at that time to rebuy it for more than the amount StoneX paid to "buy" it within 60 days, and pay interest for the privilege of waiting longer. (Bunkley Decl. at ¶ 28). As prices declined, CapRock would then sell grain to customers at ever lower prices, but be forced to repay StoneX for "buying back" grain at fixed above-market price plus ever-increasing interest. (Bunkley Decl. at ¶ 29). This put CapRock into a "buy high and sell low" situation. (Bunkley Decl. at ¶ 29).

T.      An additional blow to the business and the operation of the StoneX Agreement took place in Summer 2023. On July 31, 2023, Defendant became aware that the physical inventory in the Baltimore facility was less than the inventory reflected in CapRock's books. (Bunkley Decl. at ¶ 31). It was ultimately determined that the missing inventory–over $2.2 million of primarily soybean meal–had been stolen from the Baltimore facility. (Bunkley Decl. at ¶ 31). CapRock was thus missing millions of dollars of its inventory that StoneX had "bought." (Bunkley Decl. at ¶ 31).

U.       StoneX grew concerned whenever the amount CapRock exceeded the "credit limit" that StoneX unilaterally imposed. (Bunkley Decl. at ¶ 32). When this happened, StoneX would require CapRock to "move inventory to accounts receivable," in effect requiring CapRock to "buyback" enough of the grain it had "sold" to StoneX to reduce the balance owed. (Bunkley Decl. at ¶ 32). After learning of the Baltimore theft, StoneX representatives met with CapRock in August 2023. (Bunkley Decl. at ¶ 33). StoneX told CapRock to move a significant amount of the "inventory to accounts receivable," that is—"buy back" the grain at the agreed prices within 60 days. (Bunkley Decl. at ¶ 33). CapRock informed StoneX that the amount of "moving of inventory" StoneX required would cause a "cash crush" which would seriously inhibit CapRock from continuing business operations. (Bunkley Decl. at ¶ 35). CapRock left that meeting believing that StoneX would work with CapRock to gradually bring the amount owed to a lower level, and began work on a forbearance agreement per the parties' discussions. (Bunkley Decl. at ¶ 33). However, StoneX instead sent two simultaneous letters to CapRock on August 23, 2023. (Bunkley Decl. at ¶ 34). The first letter was a "Notice of Default," declaring CapRock to be in default because it had breached the StoneX Agreement, and ordering CapRock to cease and desist from shipping further grain from the Baltimore facility. (Motion at Exh. I). The second letter stated that due to the default StoneX was accelerating the amounts CapRock owed, and demanding $16 million (an amount StoneX calculated unilaterally) within one business day. (Motion at Exh. J).

V.       The same day StoneX sent the letters to CapRock (August 23, 2023), StoneX sent notices to CapRock's customers stating that CapRock had assigned its accounts receivable to StoneX and demanding that CapRock's customer pay StoneX all amounts they owed to CapRock. (Bunkley Decl. at ¶ 34; Exh. 7 to StoneX Proof of Claim, Exhibit E to this Response).

As StoneX was well aware, due to the decline in the market price of soybean products and the missing inventory, CapRock lacked the ability to generate revenue necessary to pay StoneX the full amount allegedly owed. (Bunkley Decl. at ¶ 35). After receiving these two letters from StoneX, CapRock was thus forced to file and begin Chapter 11 bankruptcy proceedings on August 25, 2023. (Bunkley Decl. at ¶ 37).

## SUMMARY JUDGMENT STANDARD

This Court may grant StoneX's Motion only if StoneX shows that there is no genuine dispute as to any material fact and StoneX is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] conclusory assertion that the [plaintiff lacks] evidence is insufficient[,]"); *O'Farrell v. Bd. of Commissioners for Cty. of Bernalillo*, No. CIV 17-1052 JB\JFR, 2020 WL 1955292, at *13455 F. Supp. 3d 1172, 1194 (D.N.M. Apr. 23, 2020) ("however, to secure summary judgment the defendant must make some evidentiary showing that the plaintiff lacks competent evidence."). Courts must resolve all reasonable inferences and doubts in the nonmovant's favor and construe all evidence in the light most favorable to the non-movant. *See Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-252.

StoneX has failed to meet its summary judgment burden and will certainly be unable to do so after Defendant is allowed to complete discovery. This case is not "so one-sided" that it warrants a grant of summary judgment at this early, pre-discovery stage.

## ARGUMENT

### A.        There is at Least a Fact Question Regarding Whether StoneX Agreement is a Loan

Although StoneX drafted the StoneX Agreement very carefully to make it look like a purchase and sale of grain, the transactions taking place under the StoneX Agreement have all the indicia of being loans from StoneX to CapRock, secured by inventory.

The parties have agreed that New York law applies to and controls the StoneX Agreement. In New York, the question of whether a transaction is a loan is generally one of fact. *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 282 (S.D.N.Y. 2017) (without sufficient facts court cannot determine whether transaction is a loan); *US Info. Group LLC v. EBF Holdings, LLC*, No. 22-CV-6661 (PKC), 2023 WL 6198803, at *6 (S.D.N.Y. Sept. 22, 2023) (quoting *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 246 (S.D.N.Y. 2022), motion to certify appeal denied, No. 22-CV-1245 (JSR), 2022 WL 3677931 (S.D.N.Y. Aug. 25, 2022) (Whether or not a transaction is a loan is "strongly fact-bound and [the outcomes] vary considerably.").

Under New York law, it does not matter if the agreement's text says it is not a loan, or if the parties describe the transaction as a "purchase and sale"—the "loan must be 'considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it.'" *Colonial Funding*, 252 F. Supp. 3d at 280–81 (quoting *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 353 (N.Y App. 2009)). "New York courts uniformly hold that substance—not form—controls when a court determines whether a transaction is a loan."

*Haymount,* 609 F. Supp. 3d at 246; *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334; (2021); *see also Fleetwood Services, LLC v. Richmond Capital Group LLC*, No. 22-1885-CV, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023).

Here, the transactions made pursuant to the StoneX Agreement have all the hallmarks of being loans. CapRock would purchase grain, using funds provided by StoneX. And, despite language in the StoneX Agreement tying the StoneX financing to the "purchase" of specific grain, StoneX's "purchase" of grain was not made at the actual price to buy an actual lot or quantity of actual grain, but rather based upon a computed average of the prices at which CapRock sold grain at the time. When StoneX "bought" this grain it only did so after CapRock agreed to repurchase it at a specified, fixed higher price within 60 days, with "prime plus 5%" interest from then forward. While StoneX officially took title to the grain, it otherwise did nothing to act as the "owner" of the grain it "purchased." CapRock paid all storage fees. The grain was not individually marked, sequestered, or identified in any way as being either grain owned by StoneX or, more importantly, the grain associated with a particular StoneX "purchase" at a particular "sales price." StoneX never marketed grain, and did not have the requisite certificates to do so. Instead, the parties treated the transactions as what they really were—rolling financing secured by inventory, with CapRock often selling and shipping the soybeans before "buying them back" from StoneX.

StoneX's actions in 2023 show that it considered the grain to be collateral. When the market price of the soybeans declined, StoneX was not concerned with the loss of value of its possessions. Similarly, when the Baltimore theft occurred, StoneX did not act as if it was the owner of stolen property. Instead, it acted just as a lender with declining collateral—putting the borrower (CapRock) into default, and ordering that no more grain should leave the Baltimore

facility (no matter who owned it), so that the seizeable collateral value would remain as high as possible. Then it accelerated the note with an eye toward taking possession of the remaining grain to secure its loans, and sent notices to CapRock's customers directing them to pay any amounts owed to CapRock to StoneX directly.

1.  **In New York, the allocation of risk controls whether a transaction is a loan, and all the risk is allocated to CapRock.**

In New York, the single factor that distinguishes loans from purchases is the transfer of risk. As one court explained:

> [W]hen determining whether a transaction was a true sale . . . or a loan, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the [asset], the borrower's debt is extinguished and the lender's risk with regard to the performance of the [asset] is direct, that is, the lender and not the borrower bears the risk of non-performance . . ."

*Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 CIV. 9607, 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022) (*quoting Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc*., 67 F.3d 1063, 1069 (2d Cir. 1995)); *see also Adar Bays*, 37 N.Y.3d at 334 ("parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors"); *Lateral Recovery, LLC v. Capital Merch. Services, LLC*, 632 F. Supp. 3d 402, 452–53 (S.D.N.Y. 2022) ("[t]he root of the analysis involves the question of whether the transaction involves a transfer of risk.") (citation and internal quotations omitted). Thus, under New York law, StoneX is a lender, and the StoneX Agreement is a loan under New York law if StoneX faced no risk regarding the market value of the grain it "purchased" from CapRock.

The terms of the StoneX Agreement and the parties' transactions pursuant to the StoneX Agreement make it clear that StoneX faced no market risk. Whenever StoneX lent CapRock money for grain, it did so only if CapRock promised to repay it with two forms of interest—(i) the fixed higher price StoneX set prior to the transaction and (ii) the "prime plus 5%" interest it

was allowed to charge on that fixed higher price while the loan was outstanding past 60 days.[1] StoneX never (i) took possession of any of the grain it "owned;" (ii) attempted to sell or use any of the grain it had "purchased;" and (iii) had any intent to treat the grain as if it was a commodity purchase. Instead, StoneX would have CapRock hold or sell the grain as CapRock's business required and then demand repayment at a higher price than StoneX paid when it originally "bought" the grain, regardless of market conditions.

A factor New York courts must examine when looking at the transfer of risk is "whether the plaintiff is absolutely entitled to repayment under all circumstances." *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2020). "For a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 57 N.Y.S.3d 625, 632 (N.Y. Sup. Ct. 2017) (quoting *Rubenstein v. Small*, 75 N.Y.S.2d 483 (App. Div.1947).

As explained above, the StoneX Agreement provided several examples of Events of Default by CapRock for which StoneX was given the right to call in all its notes, accelerate all debts, terminate the StoneX Agreement, unilaterally determine the amount CapRock owed, and then demand payment within one business day. (StoneX Agreement, at §§ 7.1, 7.2, 7.4, and 7.7). These Events of Default were deemed to take place if CapRock failed to make a payment on any of the loans, or if it missed a payment on any loan with a balance over $100,000. (Definitions, Exh. A to StoneX Agreement, at "Event of Default" (a), (f), and "Cross Default Threshold"). Moreover, these same remedies were available to StoneX if CapRock "fails to repurchase the

---

[1] As stated above, StoneX actually charged CapRock an even higher price to buyback grain, one that does not appear to be tethered to any contract provisions.

entire quantity of the Purchased Commodity in accordance with a Sale Transaction." (StoneX
Agreement, at 2.4(a)). In other words, if CapRock fails to "repurchase" the entire amount of
grain it "sold" to StoneX as required, the StoneX Agreement gives StoneX the right to declare
default, cancel the Agreement and all transactions under the Agreement, accelerate, set an
amount owed, and demand payment in one day. Thus it is clear that StoneX was never intended
to be a "purchaser" or holder of a grain commodity. Instead, it is a lender merely securing
collateral for a loan, making sure that it never faces any market risk whatsoever.

Another factor in the transfer of risk is the very Guaranty at issue in this case. The fact
that StoneX claims it has a guaranty that "provides, in relevant part, that Mr. Bunkley is bound as
surety for and co-principal debtor with CapRock Land, and that Mr. Bunkley will 'pay
immediately and unconditionally on first demand' to StoneX any indebtedness owed by
CapRock" (StoneX Motion at ¶ 10) underscores that StoneX was "absolutely entitled to
repayment under all circumstances" and "did not assume the risk" that the commodity they
"bought" would decline in value. *LG Funding*, 122 N.Y.S.3d at 312; *see also Haymount*, 609 F.
Supp. 3d at 249–50; *Fleetwood Services*, 2023 WL 3882697, at *2. Agreements that contain
these unconditional, unfettered personal guaranties of repayment are invariably declared loans by
New York courts. *See, e.g., Davis v. Richmond Cap. Grp., LLC,* 194 A.D.3d 516, 517, 150
N.Y.S.3d 2, 4 (2021); *Haymount*, 609 F. Supp. 3d at 249–50; *Fleetwood Services*, 2023 WL
3882697, at *2; *Queen Funding*, 2022 WL 2829913, at *6.

New York courts have extensively examined very similar agreements to the StoneX
Agreement known as "merchant cash advance" ("MCA") agreements, where a seller/borrower
sells all or part of his upcoming accounts receivables for cash upfront. In a receivables-based
merchant cash advance transaction, "[t]he economic core of these transactions [is that the

seller/borrower is] provided . . . with immediate cash (and hence liquidity to operate) upon closing. In exchange, [the buyer/lender] receive[s] a portion of future receivables generated through the [seller/borrower's] operations." *In re Shoot The Moon, LLC*, 635 B.R. 797, 805 (Bankr. D. Mont. 2021) (examining New York law). The borrower/seller pays a periodic amount that is expressed as a fixed amount, but is contractually said to equal a percentage of that period's accounts receivable that the lender has "purchased." In other words, the seller of the accounts receivable pays a payment each period that is a stated fixed amount, rather than an amount calculated from the actual value of that period's receivables.

The same basic structure exists in the StoneX Agreement transactions. StoneX provides CapRock with immediate cash when it "purchases" CapRock grain inventory, setting a fixed repurchase price payment (with interest) before the transaction takes place. When CapRock "buys" the inventory back, StoneX "sells" it back to CapRock automatically. Although the original StoneX "purchase" price is related to a market average price, CapRock's "repurchase" price is unilaterally determined by StoneX at a fixed amount regardless of market conditions. StoneX takes no risk that CapRock will not "buy" the grain back, nor does it take any risk that the decline in market prices will lower the price at which CapRock "buys" the grain from StoneX. Instead, the price is fixed at onset, and can only go upwards by "prime plus 5%". Thus there is no purchase and sale—just financing that bears interest.

### 2.  The StoneX Agreement satisfies all three prongs of the New York Test for a loan.

New York state courts have established a non-exclusive three-part test they use when determining whether an MCA agreement is a disguised loan. The three prongs of this test are as follows: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare

bankruptcy." *LG Funding*, 122 N.Y.S.3d at 312; see also *Shoot The Moon*, 635 B.R. at 805 (examining New York law). The test is, once again, one of actual substance, not of the form or contract language, as "it . . . is not sufficient that that agreement is stated to have a reconciliation provision, an indefinite term, and be non-recourse if those provisions are illusory." *Capital Merch. Svcs.*, 632 F. Supp. 3d at 452.[2]

The three-part test also shows that the StoneX Agreement is a loan. For the first element, courts look to see whether the contract provides a real opportunity for "reconciliation." In the context of accounts receivable, a reconciliation exists if, under the contract, the "buyer" (lender) allows the "seller" (borrower) to adjust the fixed cash payment amount to account for changes or declines in the actual amount of receivable for the period. *See K9 Bytes*, 56 Misc. 3d at 817; 57 N.Y.S.3d at 632–33 ("The reconciliation provisions allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less, and will receive a refund of anything taken by the company exceeding the specified percentage (which often can also be adjusted downward).").

Here, "reconciliation" would be very similar—a process where the price that CapRock must "buy back" grain from StoneX is adjusted to reflect current market conditions. As explained above, there is no such provision—from the minute CapRock "sells" grain to StoneX, the payback price is fixed, and the only adjustment is *upwards* until CapRock "buys it back."

---

[2] New York courts caution that this three-part test is "only a guide" - they "do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at \*9 (S.D.N.Y. June 6, 2022). The test should not override the overall conclusion, which should be based upon the "essential question" of whether risk is transferred to the buyer/lender. *Haymount*, 609 F. Supp. 3d at, 247–48 (the "essential question" is "whether the purported . . . purchaser actually bears the risk of a . . . shortfall or if the agreement is structured to ensure an "'absolute payment obligation.'"). That question is answered above—the Stone X Agreement puts no risk on StoneX and represents an "absolute payment obligation."

Moreover, the "buyback" price is always set at an amount that exceeds the price StoneX paid when it first "bought" the grain. Thus, under the "reconciliation" portion of the New York test, the Stone X Agreement is a loan.

The second element of the test is whether there is a finite term to the agreement. "If the term is indefinite, then it 'is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.'" *K9 Bytes,* 57 N.Y.S.3d at 633; *IBIS Capital Group, LLC v. Four Paws Orlando LLC,* No. 608586/16, 2017 WL 1065071 at *5 (N.Y. Sup. Ct. March 10, 2017). "This is because [the lender/buyer's] collection of sales proceeds is contingent upon [the borrower/seller] actually generating sales and those sales actually resulting in the collection of revenue." *K9 Bytes*, 57 N.Y.S.3d at 633.

Here, the agreement is finite because it does not give CapRock the option to decide ***not to*** "repurchase" the grain it "sells" to StoneX—it must do so at the agreed "buyback" price within 60 days. In fact, the failure by CapRock to do so allows StoneX to declare default, accelerate the note, and demand payment of the full amount owed by CapRock under all transactions within one day. Moreover, from 60 days after StoneX buys the grain to the moment CapRock "buys it back," StoneX is also given the right to charge interest at "prime plus 5%". And, in reality, StoneX always charged CapRock an amount that exceeded the fixed price StoneX set at the beginning of the transaction—doing so without explanation.

The third prong of the test, "whether there is any recourse should the merchant declare bankruptcy" is perhaps the easiest to show. The StoneX Agreement specifically defines an "Act of Insolvency," to include

> [V]oluntary or involuntary commencement of any case or proceeding under any state or federal bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, or similar laws, including, without limitation, the Bankruptcy Code.

(Definitions, Exh. A to StoneX Agreement, at "Act of Insolvency"). Such an Act of Insolvency is specifically enumerated as an Event of Default, giving StoneX the right to call in and accelerate the note and demand full repayment of all amounts due within one business day. (Definitions, Exh. A to StoneX Agreement, at "Event of Default" definition (d).)

Moreover, the fact that StoneX claims a personal guaranty from Defendant is a another factor showing this transaction is a loan, as it provides further proof that the lender/"buyer" is facing no actual market risk. As the Southern District stated in *Fleetwood Services:*

> The Guaranty is tied to the merchant's obligations under the Agreement, but those obligations are not contingent upon the receipt of future receivables—if Fleetwood declared bankruptcy, it would be subject to a confession of judgment for the full Purchase Amount . . . . Thus, under the Agreement, there are virtually no circumstances where, if the accounts receivable would not be sufficient to pay the Purchased Amounts, [Guarantor] would not be absolutely entitled to repayment of that amount by [Borrower/Seller].

*Fleetwood Services,* 2022 WL 1997207, at *13, *see also Davis*, 150 N.Y.S.3d 2, 4*; Haymount*, 609 F. Supp. 3d at 249; *Queen Funding*, 2022 WL 2829913, at *6 (combination of right to default and accelerate and personal guaranty "effectively shield the lender from the risk of loss when the creditor is nearly or actually bankrupt").

Here, StoneX is absolutely protected from CapRock's insolvency in a manner reflecting its status as a lender of an inventory loan. The StoneX Agreement makes CapRock's insolvency an event of default—triggering StoneX's right to accelerate all amounts due and demand full repayment within one business day. StoneX then can also resort to the Guaranty to cover CapRock's unpaid debt, which StoneX repeatedly asserts is "of payment and not of collection," and thus "StoneX is not obligated to make any demand of CapRock Land or take any action or obtain judgment against CapRock" before Defendant must "pay immediately and

unconditionally on first demand to StoneX any indebtedness owed by CapRock." (Motion at 5, ¶11, 19-20). StoneX clearly acknowledges it faces no risk in the event of CapRock's insolvency.

### 3. The StoneX Agreement admits that it is properly characterized as a loan.

Although New York law is clear that the "substance," not the form or language of an agreement controls, it is worth noting that the StoneX Agreement itself acknowledges that it will likely be deemed a loan by courts, and StoneX took that opportunity to further underscore the fact that it was taking no risk. Section 5.1(l) of the Stone Agreement states that "to protect StoneX in the event that [the StoneX Agreement] is . . . *characterized in whole or in part as a secured transaction and not a true sale by a court of competent jurisdiction*," StoneX has a security interest in over a page's worth of CapRock's assets, including all stored grain and related assets, as well *every other asset* of CapRock, whether or not they are related to StoneX or the StoneX Agreement. This type of broad collateralization is not consistent with a "purchase" of assets. It is, however, consistent with a lender trying to secure itself from risk to the maximum extent possible. StoneX does not want to risk the possibility that a court will construe the StoneX Agreement as a loan without making sure it is fully covered when that happens.

Taking all the above factors into account, there is little doubt that the StoneX Agreement is a lending agreement, and the transactions entered into by the parties pursuant to the StoneX Agreement have all the characteristics of loans. Accordingly, there is at least a fact issue concerning whether the StoneX Agreement should be subject to New York law regulating loans, including the laws of usury. *See Colonial Funding*, 252 F. Supp. 3d at 280; *Seidel*, 79 N.Y.2d at 744. As shown below, the facts available provide more than sufficient evidence to create a fact issue as to whether the StoneX Agreement is criminally usurious under New York law.

**B.**      **At a Minimum, There is a Fact Question Whether the StoneX Agreement is Criminally Usurious**

New York law declares any interest rate above 25% to be criminally usurious. N.Y. Penal Law § 190.40; *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 141 (S.D.N.Y. 2017). In such cases, "a corporation or PLLC, or a guarantor of such an entity's debt, may assert the defense of criminal usury" to the obligation. *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 9 N.Y.S.3d 682 (2015). In order to establish the defense, the guarantor/borrower must show three things—"[(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the holder or payee with the intent to take interest in excess of the legal rate [of 25% per annum]." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 89 (2013).

Whether or not a loan is usurious is a question of fact in New York law. *Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (1984); *Hort v. Devine*, 769 N.Y.S.2d 376, 377 (2003); *Colonial Funding*, 252 F. Supp. 3d at 280. This is especially true when the usury is not clear from the face of the note. *Id.*

**1.   Despite its language, the StoneX Agreement charged interest in excess of 25%.**

The StoneX Agreement does not provide an interest rate, deferring to the "Confirmations" for the terms of each loan. As stated, "Confirmations" as such do not exist, but the Sale Contract shows interest charges of two different types. First, it sets forth a fixed, higher price for CapRock's mandatory repurchase within 60 days. Then StoneX is given the right to charge interest on that price at "prime plus 5%." (StoneX Agreement, at § 3.6).[3]

---

[3] As stated, the actual amount that StoneX charged CapRock to "buy back" the grain was always higher than the Sales Contract price, and does not appear to be tethered to any contract provision.

The StoneX Agreement pricing structure created an enormous interest rate in a declining price environment. From the fall of 2022 through CapRock's insolvency in August 2023, the price of soybean products—CapRock's primary product and the commodity that was subject to the StoneX Agreement, dropped by nearly 40%. (Bunkley Decl. at ¶ 27). StoneX was "buying" soybean products at a market rate on day 1 of the transaction, but before doing so, StoneX made CapRock promise to "buy them back" at a price higher than that day 1 price, plus interest. When StoneX "sold" that grain back to CapRock, it made a profit even though the then-current market price—the price at which CapRock could sell the inventory to actual customers—was much lower than the original price StoneX paid.

When the price of grain is declining, if the transactions between StoneX and CapRock were really purchases and sales (as StoneX contends), then the proper path for CapRock would be to just purchase grain for its customers on the open market and have StoneX keep the grain it bought from CapRock, since the price it agreed to pay StoneX was far above market. However, as explained above, that was not an option for CapRock because the StoneX Agreement prevented it from refusing to reacquire StoneX's grain purchases. And the StoneX transactions also provided that, regardless of market conditions, StoneX was still entitled to the full price it paid, despite the fact the open market price was much lower. This put CapRock in the position of buying the grain back from StoneX for more than CapRock could sell grain to its customers. In order to afford to pay StoneX for each transaction as it came due, CapRock would have to sell significantly more grain at market price than it was "buying back" from StoneX at the higher price. This additional grain would, in turn, be financed by StoneX, and the cycle of "rebuy high and sell low" would restart. This put CapRock in a spiral that ultimately resulted in its insolvency. There were multiple transactions where, although CapRock "sold" hundreds of

thousands of dollars of grain to StoneX, CapRock received no cash—instead StoneX took that cash "sales price" and used it to repay itself for amounts owed under prior loans. (Bunkley Decl. at ¶ 20 ). StoneX was lending CapRock money to pay StoneX back, and earning interest on that amount. This ultimately led to StoneX receiving ***nearly $7 million*** in such payments in 2023 without lowering the balance owed by CapRock or CapRock receiving any cash whatsoever. (Bunkley Decl. at ¶ 36).

When looking at these transactions as they actually occurred—i.e., as financing secured by inventory—the astronomical interest rates charged by StoneX become clearer. In the Allen Declaration, Dean Allen, a CPA, has set forth various ways to calculate the actual interest rate based upon the information available to Defendant.[4] For example, at the bankruptcy filing in August 2023, StoneX claims a remaining balance on its loan of $15.1 million owed by StoneX, from a starting balance of $16.3 million. (Allen Decl. at ¶ 11). The inventory and open accounts receivable account for approximately $5.2 million, along with another $1 million in cash in CapRock's possession (of which StoneX "swept" (seized) about $772,584 the day of CapRock's bankruptcy). (Allen Decl. at ¶ 11).Thus, although StoneX showed that it had lent CapRock $16.3 million, CapRock only had about $6 million in related assets on its books securing the loans. Part of that shortfall was due to the $2.2 million in grain stolen from Baltimore, but the remaining $7.7 million was money that had gone to pay StoneX without reducing the balance CapRock owed—interest. (Allen Decl. at ¶ 11). This results in an interest rate of over 78% on an annualized basis, far in excess of the criminally usurious rate of 25% required under New York law. (Allen Decl. at ¶ 11).

---

[4] As explained in the Charhon Declaration, the Allen Declaration, and the Rule 56(d) Motion above, Defendant needs additional discovery and resulting information to be able to fix an interest rate more clearly for these loans.

Looking at individual transactions, it is clear that the interest rates StoneX effectively charged were usurious for all of this time period. The Allen Declaration sets forth a set of four transactions where Allen calculated the amount of grain sold by CapRock at market prices to satisfy the obligations of the StoneX Agreement. Each time StoneX demanded repayment in 2022-2023, the price had dropped, and CapRock was forced to sell additional grain to customers in excess of what it "bought back" from StoneX.

These examples have effective interest rates between 34.8% and 91.4% - all far in excess of the rate for criminal usury in New York. (Allen Decl. at ¶¶ 14-18). These are not isolated examples, but, as the overall payments in Schedule 1 show, they are indicative of the exorbitant amounts CapRock was forced to pay StoneX in 2022-23. Thus, regardless of the "prime plus 5%" language in the StoneX Agreement, StoneX was charging CapRock criminally usurious amounts of interest for over a year.

### 2. StoneX Intended to Charge Usurious Interest.

"[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect methods, questions of usurious intent ... are typically questions of fact[.]" *Adar Bays*, 37 N.Y.3d at 339; *see also Babinsky v. Skidanov*, 784 N.Y.S.2d 540, 541 (N.Y. 2004) (criminal usurious intent is an issue of fact).

Thus, discovery is necessary to further determine the issues of StoneX's intent. However, clearly, StoneX—as the drafter of the StoneX Agreement—understood the position it was placing itself in, and that it had fully insulated itself from downside risk, no matter how the transactions were structured. StoneX understood that regardless of whether market prices were declining, it was effectively locking in a "sales price" each time it entered into a transaction with CapRock. StoneX knew that if prices went down, CapRock was effectively overpaying for the grain it "bought back" from StoneX, and that CapRock had no choice but to do so or StoneX

would call in the loan, accelerate, and demand payment for all amounts owed. It therefore had intent to charge the resulting interest rates.

The Allen Declaration sets forth an exhibit from StoneX's books that underscores StoneX's knowledge and intent. On Schedule 2 to the Allen Declaration, Stone X's books reflect that, from December 2022 to August 2023, the amount of grain StoneX "owned" went from about 9,000 tons to over 12,200 tons, yet the amount CapRock owed to StoneX did not decline—instead, it slightly increased. (Allen Decl. at ¶ 13). StoneX knew CapRock had paid it vast amounts over 2023—in excess of **ten million dollars** (Bunkley Decl. at ¶ 36),– but the "hole" CapRock was in was nonetheless getting deeper and deeper. Thus, as StoneX knew, the money CapRock paid StoneX was simply *interest*, and that interest was at a criminally usurious rate. Despite this knowledge, StoneX did nothing to change its business practices, forcing CapRock into bankruptcy.

Moreover, as set forth in the Bunkley Declaration, when CapRock "bought back" grain from StoneX, StoneX unilaterally determined which prior "sale" that "buyback" would apply to. (Bunkley Decl. at ¶ 20). Put another way, when CapRock repaid a loan on grain, StoneX determined which loans CapRock had paid. Most of the time this was done on a chronological, "first-in, first-out" basis. However, as set forth in the Bunkley Declaration, for certain transactions, StoneX would seemingly credit random transactions, or partially credit a series of transactions. A process of "cherry-picking" transactions would result in CapRock owing more to StoneX, as StoneX's chosen transactions would have a lower spread between the original price on which StoneX lent and the market price at payback.[5]

---

[5] This is another issue on which Defendant needs further discovery.

StoneX's actions in forcing CapRock into bankruptcy further show its intent. Despite the declining market, and despite the exorbitant interest charged by StoneX, CapRock was current on all inventory loan payments going into August 2023—the month StoneX called in the note and forced CapRock into bankruptcy. (Bunkley Decl. at ¶¶ 30, 35). StoneX had previously indicated a willingness to work with CapRock, as it had done with other grain suppliers. (Bunkley Decl. at ¶ 33). However, when, in early August 2023, CapRock told StoneX that the effective interest was so high that CapRock's accounts receivable would be insufficient to meet payments on future "buybacks," StoneX thus determined that it could wring no more usurious interest from CapRock. It thus saw no reason to continue the relationship, so it did not hesitate to call in the remaining debt, accelerate it, and demand payment in one business day—a move that forced CapRock to declare bankruptcy.

Thus, at a minimum, there is a fact issue regarding whether StoneX intended to create a structure where interest payments by CapRock could (and did) climb far beyond that allowed under New York usury laws.

**C.   Since the StoneX Agreement is Usurious, the Guaranty is Void.**

As shown above, at a minimum, there is a fact issue on whether the StoneX Agreement is a criminally usurious loan. If a loan is determined to be criminally usurious, it is void under New York law, resulting in the uncollectability of both principal and interest. *Adar Bays*, 37 N.Y.3d at 325–26; N.Y. Gen. Oblig. Law § 5-511. In turn, if a loan is criminally usurious, any related guaranty is void and the lender is precluded from seeking any payment from the guarantor. *Sasidharan v. Piverger*, , 993 N.Y.S.2d 646 (Sup. Ct. 2014), aff'd, 44 N.Y.S.3d 85 (2016). Thus, there is a question of fact (at a minimum) on whether Defendant owes any amounts under the Guaranty at issue here.

**D.      There is No Judicial Estoppel Here.**

StoneX adds a novel argument that because Defendant allegedly made certain statements to the Bankruptcy Court, Defendant is judicially estopped from challenging StoneX's right to collect from Defendant on the Guaranty. This argument is both factually and legally infirm. In essence, StoneX states that because Defendant made these statements in connection with the bankruptcy of CapRock, and the Bankruptcy Court has issued orders in favor of CapRock (including granting the initial stay ), Defendant derived a "benefit" and thus any statement to the contrary is "misleading" either this Court or the Bankruptcy Court.

In making this argument, StoneX wholly ignores the fact that the CapRock bankruptcy proceeding is still pending. Thus, neither CapRock nor Defendant have obtained a "benefit" from the bankruptcy court—i.e., the debts have not been discharged. *See Ardese v. DCT, Inc*., 280 Fed. Appx. 691, 696-97 (10th Cir. 2008).

Moreover, as StoneX's own case, *Patriot Mfg. LLC v. Hartwig, Inc*., 996 F. Supp. 2d 1120, 1131 (D. Kan. 2014), aff'd, 613 Fed. Appx. 753 (10th Cir. 2015), states, "[t]here is an exception that allows a court to choose not to use judicial estoppel if a party's earlier position was based on inadvertence or mistake." As the Bunkley Declaration explains, Defendant is not a lawyer, nor is he and expert on contracts, loans, or financial instruments. He is also not knowledgeable or an expert on the law and elements of criminal usury in New York (or anywhere else). His testimony regarding the character and nature of the StoneX Agreement and Guaranty are thus nothing more than his "parroting" of the talking points StoneX gave when they sold CapRock on this usurious loan transaction. (Bunkley Decl. at ¶¶ 22-23).

Moreover, as the Bunkley Declaration sets forth, because the StoneX Agreement and the actual CapRock-StoneX transactions differ so markedly in character and operation, it has taken considerable work, including consulting with experts, to determine the true nature of the StoneX-

CapRock transactions. That work had not yet begun when these statements were made to the bankruptcy court. (Bunkley Decl. at ¶¶ 22-23).

Finally, courts find inadvertence or mistake when "the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." *Patriot Mfg.*, 996 F. Supp. 2d at 1131. Here, Defendant had no motive to "mislead" the Bankruptcy Court when he made the prior statements regarding the transactions. He was not trying to conceal their true character as loans—that particular distinction would have made no difference in CapRock's bankruptcy proceedings, and certainly no difference that would have been in CapRock's favor rather than StoneX's favor.

Factually, StoneX also fails to connect the dots between these statements and any actions by the Bankruptcy Court at all. While it is true that testimony and declarations were submitted to the Bankruptcy Court, and the Bankruptcy Court did issue the orders identified by StoneX, there is no evidence that the testimony of Defendant caused these orders to issue, and there is certainly no evidence that the specific testimony and statements cited and quoted by StoneX played any role at all. None of the specific orders cited by StoneX (Exhs. BB, FF, and HH to StoneX's Motion) make any mention of testimony by Defendant, nor does either order make any statement regarding any issue covered by the statements StoneX's Motion cites as basis for its estoppel argument. Moreover, the orders cited by StoneX were all orders StoneX and CapRock agreed to prior to submission to the Bankruptcy Court.

More importantly, one of the orders StoneX points to specifically disclaims their estoppel argument. In the August 31, 2023 Order (Exh. BB to the StoneX Motion), the bankruptcy court specifically states that "nothing herein shall constitute or be deemed to constitute an admission by the Debtor, StoneX, any other creditor, or any party-in-interest, ***or constitute a waiver or***

***estoppel of any legal position of any party"*** (Exh. BB to StoneX Motion' at ¶30(a) (emphasis

added)). Similarly, the same Order states that "Nothing contained in this Interim Order shall

prejudice the rights of Debtor in any manner whatsoever, including without limitation, to . . . (ii)

oppose, contest, challenge or defend any motion, complaint or other pleading for relief filed by

StoneX in this or any other Court, or to assert any defense, counter-claim or cross-claim

cognizable under the Bankruptcy Code or applicable non-bankruptcy law, (iii) contest the

validity of any pre-petition security interest of StoneX, (iv) move to extend the automatic stay to

enjoin StoneX from seeking to enforce the personal guaranty of non-debtor Thomas Bunkley, or

(v) seek or oppose any other relief whatsoever." (Exh. BB to StoneX Motion at ¶30(c)). Thus,

StoneX's "judicial estoppel" argument fails by the terms of the very Order it cites.

>     **E.       There Are No "Liquidated Damages."**

StoneX next alleges that it is owed liquidated damages" by virtue of "simple arithmetic."

(StoneX Motion at 22). Effectively, StoneX argues that it is owed the "prime plus 5%" interest

on the amount it seeks in its Motion under the Guaranty. First, this demand is double-counting.

As stated above, the documents available to Defendant show that StoneX has already calculated

interest of "prime plus 5%" and factored that into the amount it unilaterally calculated and

demanded that CapRock pay within one business day of StoneX's August 23, 2023 letter. That

amount is the basis for StoneX's claim that "CapRock [], and therefore Mr. Bunkley, owe

StoneX $4,396,344.67." Here, StoneX is asking the Court to impose an additional 13.5% (prime

plus 5%) interest on that amount as part of its guaranty claim. That is not a "liquidated damages"

claim—it is an attempt to charge interest on (contested) interest, and StoneX cites to nothing that

allows it to double-count interest in this way.

Second, and more importantly, as shown above, there is at least a fact question as to the

validity of the StoneX-CapRock transactions which form the basis of StoneX's claim against

CapRock, and thus the basis of StoneX's claims in its Motion. Accordingly, there can be no "liquidated damages" if there is no underlying debt on which those "liquidated damages" are based.

## F.      StoneX's "Twombly" Argument Is Meritless

StoneX spends the last third of its Motion on a novel argument that somehow Defendant's Rule 8(c) affirmative defenses are invalid because they fail to comply with StoneX's vision of the *Twombly* standard, which is embodied in Rule 8(a)(2). In other words, StoneX declares that Defendant's affirmative defenses are infirm because they do not contain the "showing" and "short plain statement" required under Rule 8(a)(2).  StoneX's argument that the enhanced pleading requirements under Rule 8(a)(2) apply equally to Rule 8(c) is not, and has never been, the rule in this District, and this Court should reject StoneX's attempt to impose a heightened standard of pleading upon Defendant's affirmative defenses for a multitude of reasons.

***First***, there is no textual support anywhere in Rule 8 for StoneX's contention that a defendant who states affirmative defenses pursuant to Rule 8(c) is bound by the pleading requirements in Rule 8(a)(2). Rule 8(a)(2) specifically requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But those requirements—"a short and plain statement" and "a showing"—are nowhere found in Rule 8(c). Instead, Rule 8(c) provides only that in responding to a complaint, a defendant "must affirmatively ***state*** any avoidance or affirmative defense," nothing more. Fed. R. Civ. P. 8(c) (emphasis added). As a result, in pleading affirmative defenses, Defendant is not required to provide "a short and plain statement" for each affirmative defense in order to comply with the Rule. *See, e.g.,* C. Wright & A. Miller, Federal Practice & Procedure § 1274 (4th ed.) ("[T]he majority of courts have rightly held that

Rule 8(c) does not warrant the extension of the *Twombly* and *Iqbal* standard to affirmative defenses. Whereas Rule 8(a)(2) requires a 'showing that the pleader is entitled to relief,' Rule 8(c)(1) merely requires a defendant to 'affirmatively state any avoidance or affirmative defense.'").

**Second**, courts in this District and within the Tenth Circuit routinely refuse to apply the heightened pleading standards from *Twombly* and *Iqbal* to a defendant's answer. *See, e.g., Lane v. Page*, 272 F.R.D. 581, 588 (D.N.M. 2011). In *Lane*, the plaintiff argued that the defendants' affirmative defenses should "put [the] plaintiff on notice of how the defense applies." *Id*. The plaintiff therefore asked the court not only to strike some of the defendants' answers, but also to require the defendants to amend the remaining answers. *Id*. The defendants argued that Rule 8 does "not require them to provide factual support for their affirmative defenses" and contended that their answers adequately responded to the plaintiff's complaint. *Id*. The court refused to extend the heightened pleading standard that the Supreme Court established in *Twombly* and *Iqbal* to affirmative defenses pled in answers "because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses." *Id*.

Since the ruling in *Lane*, this District has maintained its position that the pleading standards of *Twombly* and *Iqbal* are limited to complaints and do not extend to affirmative defenses. *See, e.g., Dorato v. Smith*, 163 F. Supp. 3d 837, 882 (D.N.M. 2015) ("Given the lack of subsequent Tenth Circuit or Supreme Court decisions on point and the Court's decision in *Lane v. Page*, the Court declines Dorato's invitation to reconsider its reasoning. It will thus leave the Defendants' affirmative defenses intact."); *Wells v. Hi Country Auto Grp*., 982 F. Supp.2d 1261, 1264 (D.N.M. 2013) (reaffirming the position stated in *Lane*). Other courts in the Tenth Circuit

likewise agree that the heightened pleading standard does not apply to affirmative defenses. *See, e.g., Baum v. Faith Techs, Inc*., No. 10-CV-0144-CVE-TLW, 2010 WL 2365451, at *2-3 (N.D. Okla. June 9, 2010) (rejecting argument seeking to "require defendants to allege specific facts directly corresponding to each required element of an affirmative defense."); *Holdbrook v. SAIA Motor Freight Line, LLC*, No. 09-cv-02870-LTB-BNB, 2010 WL 865380, at *2 (D. Colo. March 8, 2010) (concluding that "the better-reasoned approach" is not to apply the *Twombly* and *Iqbal* standard to affirmative defenses). In fact, as the *Dorato* court noted, the District of Kansas case that StoneX urges the Court to "adopt" acknowledges that it is not even the prevailing rule in that District. *See Constr. Indus. Laborers Pension Fund v. Explosive Contractors, Inc*., No. 12-2624-EFM, 2013 WL 3984371, at *2 (D. Kan. Aug. 1, 2013) ("there is a split within our own district regarding the applicability of the Iqbal/Twombly standard regarding affirmative defenses.") *cf. Falley v. Friends Univ*., 787 F.Supp.2d 1255, 1259 (D. Kan. 2011) ("[T]he court determines that the pleading standards of *Twombly* and *Iqbal* should be limited to complaints—not extended to affirmative defenses.").

**Third**, StoneX cites to no case law showing that the Tenth Circuit has adopted its argument and applied the heightened pleading standard to affirmative defenses, and Defendant knows of no such authority. To the contrary, the Tenth Circuit has held that a plaintiff is on notice of a defendant's affirmative defense even where the defendant has **omitted** it from the answer. *State Distribs., Inc. v. Glenmore Distilleries Co*., 738 F.2d 405, 410-11 (10th Cir. 1984) (defendants adequately raised the affirmative defense of good faith and good cause because the pre-trial order identified those as contested issues of fact, and plaintiff "had adequate notice and opportunity to rebut the defense[.]").

***Fourth***, there are different standards for an answer to a complaint versus setting forth allegations in a complaint. As this Court noted in *Lane*, a plaintiff can prepare his complaints over years, limited only by the statute of limitations, whereas defendants have only a matter of days to answer or a defendant is deemed to admit the allegations in a complaint if he does not respond. 272 F.R.D. at 596. On the other hand, a plaintiff may largely ignore an answer without formal legal consequence. *Id.* (citing Fed. R. Civ. P. 55). Moreover, a defendant risks waiving affirmative defenses that are omitted from his answer. *See* Fed. R. Civ. P. 12(g)(2), (h)(1)(A). Thus, the Tenth Circuit has expressly recognized that "counsel often plead vast numbers of affirmative defenses without being sure whether the facts will ultimately support such defenses[.]" *Wanamaker v. Albrecht*, No. 95-8061, 1996 WL 582738, at *5 (10th Cir. Oct. 10, 1996). In the court's words, "such pleading is done precisely so that the defenses will be preserved should discovery or further proceedings reveal factual support." *Id.*

Contrary to StoneX's contention, Defendant's affirmative defenses are sufficiently pled and meet the requirements of Rule 8. Accordingly, the Court should deny StoneX's prematurely filed Motion and afford Defendant sufficient opportunity to conduct discovery on its affirmative defenses.

## **CONCLUSION**

The evidence before this Court establishes that, at a minimum, there is a fact issue regarding whether the StoneX Agreement is a loan agreement, as well as whether the loans under the StoneX Agreement are criminally usurious. Thus, there is a question of fact regarding whether Defendant owes anything under the Guaranty.

StoneX's arguments on judicial estoppel are both factually and legally infirm. No discernable benefit has been derived from any of Defendant's prior statements in the CapRock

bankruptcy, and the statements of Defendant in that forum were not definitive, as they were declarations of a layman merely parroting StoneX talking points.

Nor is StoneX entitled to any so-called "liquidated damages" as a matter of law. The "liquidated damages" that StoneX seeks are nothing more than an attempt to double-count interest, and as there is a question of fact as to whether the underlying debt is owed, there is a question as to whether any amounts are owed under the Guaranty, including this dubious interest claim.

Finally, StoneX's argument that Rule 8(a)(2) should apply to Defendant's affirmative defenses also fails as a matter of law. This District and this Circuit impose no such rule, and imposition of such a rule prior to any discovery in this case goes directly against the Tenth Circuit's philosophy regarding defensive pleadings.

StoneX's Motion must therefore be denied in all respects, and this case should be allowed to proceed to discovery.

Dated: March 7, 2024

Respectfully submitted,

/s/ Vincent J. Ward
Vincent J. Ward
**THE WARD LAW FIRM**
P.O. Box 7940
Albuquerque, NM 87194
Telephone: 505-944-9454

and

Brett Charhon
Texas State Bar No. 24040674
bcharhon@ccrglaw.com
Martin C. Robson
Texas State Bar No. 24004892
mrobson@ccrglaw.com
**Charhon Callahan
Robson & Garza, PLLC**
3333 Lee Parkway, Suite 460

Dallas, Texas 75219
Telephone: (214) 521-6400
Email: vincent@wardlawnm.com

*Counsel for Thomas Bunkley, III*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon the following recipients by e-mail on March 7, 2024.

Isaac Estrada, Esq.
Polsinelli PC
555 Fayetteville St., Suite 720
Raleigh, NC 27601
Email: iestrada@polsinelli.com

Michael Schuster
Polsinelli PC
1401 Lawrence Street
Suite 2300
Denver, CO 80202
720-931-1188
Email: mschuster@polsinelli.com

Jane Pearson
Polsinelli PC
1000 2nd Ave
Suite 3500
Seattle, WA 98104
Email: jane.pearson@polsinelli.com

/s/ Vincent J. Ward
Vincent J. Ward